UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT  :           3:20MJ315(TOF)
                      :
                      :    ss: Hartford March 27, 2020
                      :
COUNTY OF HARTFORD    :

<u>AFFIDAVIT</u>

I, Michael Caron, a Special Deputy United States Marshal, having been duly sworn, do hereby state:

## I.  **INTRODUCTION**

1.     I am a Detective with the Hartford Police Department ("HPD") and have been employed as a Hartford Police Officer since 2009.  My responsibilities as a Hartford Police officer include investigating and enforcing city and state criminal laws.  I am also currently assigned to the Northern Connecticut Violent Crimes Gang Task Force (hereafter the "NCVCGTF"), which is a Federal Bureau of Investigation (FBI) sponsored task force consisting of law enforcement agents from the FBI, and officers and detectives from the Hartford Police Department, East Hartford Police Department, Connecticut Department of Correction and the Connecticut State Police.  The NCVCGTF task force is dedicated to combating violent crime and firearms and narcotics violations in and affecting Hartford, Connecticut, and the surrounding areas.  As a member of the NCVCGTF, I have been duly deputized as a Special Deputy United States Marshal and FBI Task Force Officer pursuant to 18 U.S.C. § 2510(7), which authorizes me to investigate violations of federal criminal law.

2.     I attended the Hartford Police Academy in Hartford, Connecticut, where I received law enforcement training, to include firearms training, the execution of search and seizure warrants, investigative techniques, and legal instruction, which covered Fourth Amendment

1

searches and seizures.  I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations.  I have executed seizure warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities.

3.      During my career in law enforcement, I have participated in investigations involving the illegal distribution of controlled substances, firearms and gang related acts of violence to include homicides, shootings, robberies and home invasions. I have coordinated controlled purchases of illegal drugs and firearms utilizing confidential sources and cooperating witnesses.  I have written and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs, conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution, analyzed records documenting the purchase and sale of illegal drugs, and provided testimony in Federal and State Grand Jury proceedings. I have also interviewed admitted drug traffickers, drug users, gang members, informants and cooperating defendants, as well as local, state and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have supervised the activities of informants and cooperating witnesses who have provided information and assistance in the federal prosecution of drug offenders.

4.      I am one of the case agents who has directed the investigation that is the subject of this Affidavit in conjunction with law enforcement agents and officers, and I am thoroughly familiar with the information contained herein.

5.      This Affidavit is submitted for the limited purposes of establishing probable cause for the issuance of: a) a criminal complaint and arrest warrant for Anthony DONES, a.k.a. "Ant"

("DONES"), with a date of birth of xx-xx-1981; b) a criminal complaint and arrest warrant for Juan LAUREANO, a.k.a. "Pito" ("LAUREANO"), with a date of birth of xx-xx-1980; and c) a search and seizure warrant for 17 Montrose Street, Hartford, Connecticut (hereafter the "**Target Premises**").  Because this affidavit is submitted for these limited purposes, I have not included each and every fact known to me regarding this investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause.

6.      17 Montrose Street, Hartford, Connecticut is a single-family residence located on the west side of Montrose Street between New Britain Avenue and Waterford Street.  The residence is primarily adorned of green siding with the numerals "17" affixed above the single car garage.

7.      As detailed herein, DONES had been distributing fentanyl in Hartford and uses the **Target Premises** to process, package, store, and distribute fentanyl. The investigation has also revealed that DONES resides at the **Target Premises**.

## II. SUMMARY OF THE INVESTIGATION

8.      In December 2019, a Federal Bureau of Investigation ("FBI") Confidential Human Source (hereafter "CHS") began providing information to the investigators about DONES. The CHS had not previously provided information to investigators but his/her information was consistent with other information investigators had obtained about DONES. Moreover, the CHS' information was corroborated by evidence obtained through his/her proactive cooperation, as described herein.  The FBI is paying the CHS for his cooperation.

9.      The CHS stated that DONES is receiving either ounce or kilogram quantities of fentanyl and using his residence at 17 Montrose Street Hartford, Connecticut to package and distribute these narcotics to other "street level" dealers in the south end of the city.

10.     The CHS informed the affiant that s/he has been inside the **Target Premises** in the past, but only on a couple occasions. That during those times, DONES would have a "babysitter" watch the CHS at all times. The CHS specified that DONES would have one of his "guys" watch every move of the CHS, to include making sure the CHS was not taking pictures of anything in the **Target Premises**. The CHS stated that DONES also has multiple security cameras located around his house with the monitor on television screen in the basement.

11.     During one of the times the CHS was inside the residence, s/he had observed DONES in the basement of the **Target Premises** breaking off a portion of fentanyl from a "brick." The CHS stated that s/he believed the "brick" to be a kilogram of fentanyl on a table in the basement. That DONES then broke off a smaller portion from the "brick" and began to "cut" it up to distribute to "his crew." The CHS stated that s/he observed individuals arrive and park in the front of the **Target Premises** and that DONES or LAUREANO would bring fentanyl to these individuals.

12.     The CHS also informed the affiant that s/he had observed DONES in possession of a pistol inside the **Target Premises**. The CHS stated DONES was waving the gun around as if he was attempting to intimidate the CHS. DONES had also commented previously about possessing multiple firearms.

13.     The CHS also provided investigators with DONES wireless phone number, (860) 913-0689, which according to the CHS, DONES uses to conduct his illegal drug sales.

14.     Hartford Police Officer Brian Herrmann had received consistent information from a confidential informant (hereafter the "CI") regarding DONES. The CI is a registered informant with the Hartford Police Department and has previously provided information in that has led to the arrests and seizure of firearms and narcotics. The CI informed Officer Herrmann that DONES

was a high-level fentanyl dealer, that DONES used his residence of 17 Montrose Street (the **Target Premises**) to distribute fentanyl, and that DONES would sell fentanyl only to a select group of individuals who he trusted.

### Controlled Narcotics Purchase on January 20, 2020

15.     On January 20, 2020, the Affiant met with the CHS at a secure meeting location for the purpose of having the CHS purchase narcotics from DONES.  The CHS was searched and not found to be in possession of any illegal contraband.  At approximately 1:34 p.m., while in the presence of the Affiant, the CHS called (860) 913-0689. This phone call was on "speaker mode" and witnessed by investigators. A male, who CHS identified as DONES, answered the phone.  The CHS told DONES that s/he needed a "stack" (100 bags of heroin/fentanyl).   DONES then instructed the CHS to go to the same spot, which the CHS knew was Nepaug Street (two streets east of the **Target Premises**) from past interactions with DONES.

16.     At the secure location, the Affiant provided the CHS with $250 in FBI evidence funds, along with recording and devices (audio/video) as well as an audio and GPS transmitting device.  At approximately 1:51 p.m., the CHS left the secure location in his/her vehicle, while followed by investigators. At approximately 1:54 p.m., investigators observed CHS arrive in the area of Nepaug and Waterford Streets and park. Upon arriving, investigators heard, from the audio transmitter, the CHS make a phone call. That call went to voicemail. At approximately 1:56 p.m., the CHS made another call and is heard speaking with the same male voice that was overheard from the initial call at the secure location. At about this same time, TFO Cutler observed a silver sedan leave the **Target Premises**.

17.     At approximately 1:58 p.m., the Affiant observed a silver Mercedes arrive at the CHS's location and park along the driver side. The Affiant then observed the CHS exit his/her

vehicle and lean into the passenger side window of the Mercedes. After a brief meet, the CHS is observed returning to his/her vehicle while the silver Mercedes leaves the area. During this time, TFO Pelletier was able to identify the registration plate number on the silver Mercedes (CT AU77300).

18.     At approximately 2:02 p.m., investigators met with the CHS at a secure meeting location where the CHS handed the Affiant one knotted clear piece of plastic containing approximately 100 white wax paper sleeves, each containing a white powdery substance, and the recording and transmitting devices.  Investigators also searched the CHS's vehicle and person for any illegal contraband, with negative results.  A drug test on a small portion of the white powdery substance had a positive reaction for the presence of fentanyl.

19.     CHS told investigators that s/he arrived in the area of Nepaug Street and parked. CHS then called DONES and informed him that s/he was there.  DONES told the CHS that he would be there in a minute.  A short time later, CHS observed a silver Mercedes arrive and park alongside the CHS's vehicle. DONES lowered the passenger side window and the CHS recognized the operator to be DONES.  CHS then exited his/her vehicle and leaned into the passenger side window of the Mercedes. DONES handed the CHS the fentanyl in exchange for the FBI evidence funds. Once the transaction was complete and DONES left the area.

### Controlled Narcotics Purchase on January 23, 2020

20.     On January 23, 2020, at approximately 4:56 p.m., investigators met with the CHS at a secure meeting location for the purpose of having the CHS purchase narcotics from DONES. The CHS was searched and not found to be in possession of any illegal contraband.  The CHS informed investigators that s/he had been in contact with DONES prior to meeting with investigators, which was done through text message.  The CHS told DONES that s/he needed a

"stack" (100 bags of heroin/fentanyl) and that s/he was on the way to Hartford. During those text messages, DONES instructed the CHS to go to the same spot (Nepaug and Waterford Streets).

21.     At the secure location, the Affiant provided CHS with $250 in FBI evidence funds, along with recording devices (audio/video) and an audio and GPS transmitting device.  Shortly after, while followed by investigators, the CHS left the secure location and arrived in the area of Nepaug and Waterford Streets at approximately 5:04 p.m.

22.     At approximately 5:05 p.m., investigators heard the CHS, from audio transmitter, speaking with DONES on his/her cell phone. During that conversation, DONES questioned the CHS about his connection in New Haven. The CHS had previously told DONES that s/he could purchase fentanyl in Hartford and sell it in the New Haven area for a large profit. From the audio transmitter, investigators heard DONES as he called out multiple surveillance vehicles in the area and tell the CHS that he needs to "protect himself."  The CHS informed DONES that s/he is going to leave the area and DONES responded that he will call the CHS with a new meeting location.

23.     At approximately 5:21 p.m., investigators heard, from the audio transmitter, an incoming phone call to the CHS. The CHS is heard speaking with DONES, who informed the CHS that he was going to "send my boy to see you." DONES then directed the CHS to the area of New Britain and Hillside Avenues.

24.     At approximately 5:27 p.m., the CHS called DONES, which is heard on the audio transmitter, and informed him that s/he is arriving in the area and to "make sure your boy is there." At approximately 5:30 p.m., the CHS arrived in the area of Hillside and New Britain Avenues and parked. At about the same time, investigators heard a vehicle horn over the audio transmitter and simultaneously observed the CHS moving via the GPS transmitting device. The CHS then stopped around the corner, on Sherbrooke Avenue, just west of Hillside Avenue.

25.     At approximately 5:31 p.m., investigators hear, from the audio transmitter, he CHS talking with a male party. A moment later, the GPS showed that the CHS was on the move.

26.     At approximately 5:51 p.m., the CHS returned to the secure meeting location and handed over 85 white wax paper sleeves, each containing a white powdery substance. A portion of this white powdery substance was later tested using a NARK II kit, testing positive for the presence of fentanyl. The CHS informed investigators of the following. Upon arriving in the area of Nepaug and Waterford Streets, the CHS called DONES to inform him that s/he was there. During the call, DONES questioned the CHS on his/her connection to New Haven and pointed out vehicles that appeared suspicious. The CHS played along with DONES' concerns, and moved out of the area. After giving it some time, the CHS called DONES who instructed the CHS to go to New Britain and Hillside Avenues and that DONES was going to send "his boy." When the CHS arrived at New Britain and Hillside Avenues, s/he called DONES to report s/he was there. A moment later, the same silver Mercedes pulled alongside his/her vehicle. The Mercedes "beeped" its horn and began to drive. The CHS followed the Mercedes around the corner to Sherbrooke Avenue, and parked.  The CHS exited his/her vehicle and entered the front driver side of the silver Mercedes, and immediately recognized the operator as Juan LAUREANO, a.k.a. "Pito." The CHS and LAUREANO completed the exchange of the evidence funds for the fentanyl. Prior to exiting the Mercedes, the CHS asked "Pito" to pass along a message that the CHS wanted to meet with DONES later that evening.

### Consensual Meeting between CHS and DONES on January 23, 2020

18.     After the controlled purchase, the CHS informed investigators that s/he felt that it important to meet with DONES to smooth things over. The CHS believed that if s/he could meet with DONES, s/he could convince him to trust him/her again. Investigators agreed and planned to

supervise a meeting later that evening.

19.     At approximately 7:30 p.m., investigators met with the CHS and provided him/her with an audio and GPS transmitting device. Shortly after, investigators followed the CHS to New Britain and Hillside Avenues. At approximately 7:54 p.m., investigators observed the same silver Mercedes sedan arrive and park in close proximity to the CHS. A male party is observed exiting the Mercedes and entering the front passenger seat of the CHS's vehicle. From the audio transmitter, investigators hear a male voice consistent with DONES instructing the CHS to drive to Sherbrooke and Hillside Avenues. From the audio transmitter, investigators heard DONES explain that he observed a black Hyundai SUV follow the CHS and that he had previously seen this vehicle, making him suspicious of the CHS. DONES explained further that he does not meet people at his house and that he "even took out the guns I had, I took out." The CHS explained to DONES that s/he had an opportunity to make money (buying fentanyl in Hartford and selling it in New Haven) in an attempt to convince DONES to trust him. The CHS then asked DONES if he trusted him. DONES responded, "if I didn't trust you, I would have never came back . . . And I wouldn't have never served you that time, and I would have been like that's a rat, that done." DONES continued telling the CHS that "we good," but that to be more cautious DONES would meet the CHS at different locations..

**Controlled Narcotics on January 31, 2020**

20.     At approximately 3:07 p.m., investigators met with the CHS at a secure meeting location for the purpose of having the CHS purchase narcotics from DONES. The CHS was searched and not found to be in possession of any illegal contraband.  At approximately 3:11 p.m., while in the presence of investigators, the CHS called DONES at (860) 913-0689. This phone call was on "speaker mode" and witnessed by investigators. DONES answered and the CHS told him

that s/he needed "two stacks" (200 bags of heroin/fentanyl).  DONES instructed the CHS that he
needed twenty minutes, because he had to pick up his kids.

21.     At the secure location, investigators provided the CHS with $500 in FBI evidence
funds (as well as an additional $60 for a previous drug debt), along with recording devices
(audio/video) and an audio and GPS transmitting device.  Shortly after, while followed by
investigators, the CHS drove to the area of Grant Street, Hartford, which runs parallel to is the next
street west of Montrose.

22.     At approximately 4:14 p.m., investigators heard, from the audio transmitter, the
CHS make a phone call. At about the same time, investigators observed LAUREANO exit the
**Target Premises** and enter the silver Mercedes. DONES followed LAUREANO and entered a
white Jaguar SUV. Both vehicles then left the **Target Premises**.

23.     At approximately 4:16 p.m., the CHS is heard, from the audio transmitter, speaking
with a male person. Due to DONES's acute awareness of surveillance, investigators stayed away
from the immediate area. Shortly after, the CHS made contact with investigators and reported that
the deal was done and was on the way to the secure meeting location.

24.     Upon returning to the secure meeting location, the CHS handed over approximately
200 white wax paper sleeves, each containing a white powdery substance.  A portion of this white
powdery substance was later tested using a NARK II kit, testing positive for the presence of
fentanyl. The CHS informed investigators that LAUREANO arrived in the silver Mercedes, exited
and questioned the CHS about his jacket zipper. It appeared to the CHS that LAUREANO
suspected it was a recording device. After a brief conversation, LAUREANO returned to his
vehicle while the CHS stood outside the Mercedes.  DONES then arrived in the white Jaguar SUV
and parked alongside LAURENO's vehicle. DONES immediately questioned the CHS about

10

his/her watch, making the CHS believe that DONES thought it was a recording device. The CHS completed the transaction with LAUREANO and left the area.

### Controlled Narcotics Purchase on February 12, 2020

25.     On February 12, 2020, investigators met with the CHS at a secure meeting location for the purpose of having the CHS purchase narcotics from DONES. The CHS was searched and not found to be in possession of any illegal contraband.  At approximately 4:47 p.m., while in the presence of investigators, the CHS called DONES at (860) 913-0689. This phone call was on "speaker mode" and witnessed by investigators. DONES answered and the CHS told DONES that s/he needed a "stack" (100 bags of heroin/fentanyl).  DONES instructed the CHS to go to Grant Street.

26.     At the secure location, investigators provided CHS with $250 in FBI evidence funds, along with recording devices (audio/video) as well as an audio and GPS transmitting device. At approximately 4:49 p.m., the CHS left the secure location in his/her vehicle, while followed by investigators, drove to Grant Street and parked. At approximately 4:54 p.m., the CHS is heard, from the audio transmitter, calling DONES and DONES telling the CHS that he will be right there.

27.     At approximately 4:45 p.m., SA Medina observed DONES exit the **Target Premises** and enter the front passenger seat of the same silver Mercedes parked out front. Approximately one minute later, SA Medina observed DONES exit the silver Mercedes and point in the direction of Grant Street. DONES is observed walking back towards the **Target Premises** and the silver Mercedes is observed driving south on Montrose Street.

28.     At approximately 4:58 p.m., investigators heard the CHS speaking, from the audio transmitter, with a male party. From previous interactions, the voice was consistent with LAUREANO. Approximately one minute later, the GPS showed the CHS leaving Grant Street.

29.     At approximately 4:59 p.m., SA Medina observed the silver Mercedes arrive back at the **Target Premises** and park. Upon its return, DONES is observed leaving the front porch of the **Target Premises** and walking to the silver Mercedes.  DONES entered the front passenger seat and the Mercedes drove north on Montrose.

30.     Investigators meet with the CHS at the secure meeting location where the CHS handed over approximately 98 white wax paper sleeves, each containing a white powdery substance.  A portion of this white powdery substance was later tested using a NARK II kit, testing positive for the presence of fentanyl. The CHS informed investigators that s/he arrived on Grant Street and called DONES. DONES informed the CHS that he would be there shortly. Shortly after, LAUREANO arrived in his silver Mercedes. The CHS then gave LAUREANO the investigative funds in exchange for the fentanyl. After the transaction, they both parted ways.

### Controlled Narcotics on February 20, 2020

31.     On February 20, 2020, investigators met with the CHS at a secure meeting location for the purpose of having the CHS purchase narcotics from DONES. The CHS was searched and not found to be in possession of any illegal contraband.  The CHS informed investigators that prior to arriving s/he had contacted DONES and told him he needed a "stack" (100 bags of heroin/fentanyl). At approximately 6:16 p.m., while in the presence of investigators, the CHS called DONES at (860) 913-0689. This phone call was on "speaker mode" and witnessed by investigators. DONES answered the phone and the CHS reported that s/he was in the area.  DONES instructed the CHS to go to the "same spot" (Grant Street). At approximately 6:18 p.m., CHS left the secure location in his/her vehicle, and followed by investigators to Grant Street where s/he parked.

32.     At approximately 6:23 p.m., investigators heard, from the audio transmitter, the

12

CHS call DONES. The CHS told DONES that s/he observed a possible police vehicle upon arriving on Grant Street. DONES replied that he will call the CHS in a minute. At approximately 6:27 p.m., investigators heard, from the audio transmitter, the CHS answer a call from DONES who instructed the CHS to go to a new meeting location. The GPS showed the CHS moved to the area of Montrose and Sprague Streets.

33.     At approximately 6:34 p.m., investigators heard, from the audio transmitting device, the CHS speaking with DONES in person. Seconds later, the conversation is over and the GPS transmitting device showed the CHS moving. Shortly after, investigators observed a blue SUV arrive at 17 Montrose Street.

34.     At approximately 6:38 p.m., investigators met the CHS at the secure meeting location where the CHS handed over approximately 100 white wax paper sleeves, each containing a white powdery substance.  A portion of this white powdery substance was later tested using a NARK II kit, testing positive for the presence of fentanyl. The CHS informed investigators that upon arriving on Grant Street, s/he called to DONES and told him that s/he observed a police vehicle in the area. DONES stated that he would call back in a minute. DONES then called and informed the CHS to take a left and then another left. The CHS did so, and moments later, a mid-sized blue SUV arrived and pulled alongside the CHS's vehicle. The CHS recognized the front passenger to be DONES, but it was too dark for the CHS to identify the operator.  The CHS handed DONES the FBI investigative funds, in exchange for the fentanyl.

### Controlled Narcotics Purchase on March 5, 2020

35.     On March 5, 2020, investigators met with the CHS at a secure meeting location for the purpose of having the CHS purchase narcotics from DONES. The CHS was searched and not found to be in possession of any illegal contraband.  Prior to meeting with the CHS, surveillance

was established at the **Target Premises**. During this time, investigators observed several individuals in the front yard of the **Target Premises**, to include DONES, who was wearing a black hooded sweatshirt.

36.     At approximately 5:53 p.m., while in the presence of investigators, the CHS called DONES at (860) 913-0689. This phone call was on "speaker mode" and witnessed by investigators. DONES answered and the CHS told DONES that s/he needed "two pancakes" (200 bags of heroin/fentanyl).  DONES told the CHS he needed 15 minutes. While still at the secure location, the CHS called DONES again, but the call went to voicemail. At approximately 6:14 p.m., the CHS made a third call to DONES. DONES informed the CHS that he observed the police in the area. The CHS told DONES that s/he would drive around the area to ensure he was not being followed and that s/he will go to the "same spot."

37.     At the secure location, investigators provided CHS with $500 in FBI evidence funds, along with recording devices (audio/video) as well as an audio and GPS transmitting device. At approximately 6:18 p.m., CHS left the secure location in his/her vehicle, while followed by investigators to the area of Grant and Stafford Streets, where the CHS parked. At approximately 6:24 p.m., investigators heard, from the audio transmitter, the CHS call DONES and DONES tell him/her that he will be right there.

38.     During this time, the affiant established surveillance of the **Target Premises**. The affiant observed a vehicle arrive and park directly across the street from the **Target Premises**. No one was observed exiting this vehicle. At approximately 6:30 p.m., the affiant observed DONES' white Jaguar SUV arrive and park in the driveway of the **Target Premises**. An individual dressed primarily in all dark clothing exited the vehicle and walked towards the front entrance of the **Target Premises**. At approximately 6:34 p.m., the affiant observed the same individual exit the

**Target Premises** and walk across the street to where the other vehicle was parked. Investigators then drove by this location and confirmed the vehicle parked across the street from the **Target Premises** was LAUREANO's silver Mercedes.  Investigators then observed that the male dressed in dark clothing meeting with the operator of the silver Mercedes. The Affiant then observed the dark-clothed person walk away from the silver Mercedes to the **Target Premises**, as the silver Mercedes did a U-turn and traveled south on Montrose Street.

39.     At approximately 6:36 p.m., investigators observed the silver Mercedes pull up next to the CHS's vehicles on Grant Street. From the audio transmitter, investigators heard the CHS speaking with a male voice consistent with LAUREANO. After a brief conversation, the CHS departed the area and drove to the secure meeting location. At approximately 6:38 p.m., the Affiant observed the silver Mercedes arrive and park across street from the **Target Premises**. The Affiant then drove by the **Target Premises** and observed the dark-clothed individual standing on the curb of the **Target Premises** was DONES.

40.     Tt the secure meeting location, the CHS handed the Affiant approximately 200 white wax paper sleeves, each containing a white powdery substance. A portion of this white powdery substance was later tested using a NARK II kit, testing positive for the presence of fentanyl. The CHS informed the Affiant that s/he went to Grant Street as agreed. Upon arriving, the CHS called DONES and DONES stated that he would be there shortly. A couple minutes later, the silver Mercedes arrived and parked next to his/her vehicle. The CHS handed LAUREANO the FBI investigative funds in exchange for the fentanyl.

## Post March 5, 2020 Events

41.     On March 17 and 18, the CHS received multiple text messages from DONES that indicated that DONES believed that CHS was cooperating with law enforcement.  Investigators

confirmed that the phone number sending the text messages was the known phone number of

DONES.  DONES' phone transmitted the following text messages:

- I know about ur friend from New Haven I knew it u piss of shiet

- I don't have to explain to you what it is you know what you did

- What boy the police officer

- We good just loose my number

42.     The CHS responded to the text messages with claims that he did not know or

understand what DONES' meant, but given DONES' earlier suspicions, investigators concluded

that the CHS could no longer safely be used to communicate with or cooperate against DONES.

On March 16, 2020, investigators met with the CHS in a plaza on Franklin Street to pay him/her

for his proactive cooperation.  The CHS believes that someone saw the covert meeting and reported

it to DONES.

43.     Even though the last controlled narcotics purchase from DONES and LAUREANO

occurred on March 5, 2020, there is still probable cause to believe that fruits, instrumentalities and

evidence will be found at the **Target Premises**.  As described herein, DONES was suspicious of

the CHS after the first controlled buy, but continued to sell him fentanyl. While DONES limited

his direct interaction with the CHS, DONES continued to communicate directly with CHS even

though he tasked LAUREANO to make most of the drug deliveries.  In the January 23 transaction,

DONES told CHS that he was sending "his boy" to complete the deal.  In the January 31

transaction, LAUREANO traveled directly from the **Target Premises** to the deal with the CHS.

In the February 12 transaction, DONES met with LAUREANO outside the **Target Premises**

immediately before LAUREANO met the CHS to complete the transaction.  In the February 20

transaction, DONES delivered the fentanyl to CHS, though he came in an unknown vehicle.  In

the March 5 transaction, DONES again met LAUREANO outside the **Target Premises** before LAUREANO made the delivery.

44.     DONES statements to the CHS on January 23, 2020 that he does not meet people (customers) at the house suggests that DONES' may believe his drug operation and any contraband stored at his residence are safe because DONES has not negotiated drug deals at the **Target Premises**.  DONES' statement that he removed his guns is not likely true because there would be no need to tell that to the CHS.

45.     DONES continues to reside at the **Target Premises**.  On March 25 and 26, investigators on multiple occasions drove past the **Target Premises**.  On each occasion, investigators observed both of DONES' vehicles (white Jaguar SUV and red Mercedes) parked in front.  Throughout the investigation, the only location that DONES appeared to be using to store, process, or package fentanyl was the **Target Premises**.  Even if DONES has moved his guns and contraband from the residence, there is still probable cause to believe that other evidence of his criminal conduct is at the **Target Premises**.  For example, there is probable cause to believe that DONES would have at the **Target Premises**: wireless phones used to facilitate his drug trafficking operation (to include the phone DONES used to communicate with the CHS), sales receipts and other records reflecting the expenditure of drug proceeds, currency and money wrappers, records of bank transactions made to conceal and launder drug trafficking proceeds, and records and other items or indicia documenting the acquisition of assets such as vehicles and other items of value.  According to the Connecticut Department of Labor neither DONES nor his wife, Wilmary Rosa, with whom he lives at the **Target Premises**, have received reported income for the past two years.

## III.   <u>CONCLUSION</u>

46.      During my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved, in part, drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking, and related offenses such as violations of firearms laws. My involvement in these investigations has resulted in the successful prosecution of numerous individuals and the forfeiture of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate these violations.  Search warrants relating to these investigations have covered vehicles, residences of drug traffickers and their co-conspirators, "stash houses" used as storage and distribution points for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

47.      Materials searched for and recovered in these locations have included various controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; wireless telephones, paging devices, computers and computer disks, answering machines; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking.  These items obtained by search warrants, constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

48.      Based on my training, experience, and participation in this and other drug trafficking investigations, I know that:

a.   drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

b.   drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

c.   even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.   drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business;

e.   drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

f.   drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore the above mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g.   drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

h.   drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

i.   drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions.  However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create

19

another type of drug record to assist the trafficker in the collection of drug debts;

j.   drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

k.   drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

l.   drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

m.   persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n.   drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds.  These photographs and video movies are normally in the drug traffickers possession or residence;

o.   the State of Connecticut is generally viewed as a consumer state in regards to narcotic activity.  However, it is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics for distribution.  It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers.  It is known that drug traffickers' methods include, but are not limited to: commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers.  It is known that the residences of drug traffickers will often contain records of drug related travel.  These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

p.   based on my training and experience, drug traffickers commonly have firearms, ammunition and other weapons in their possession, in their cars,

on their person, at their residence including, but not limited to handguns, rifles, shotguns, automatic weapons, knives, ammunition, and magazines. These firearms and weapons are most often kept to protect and secure drug traffickers' property;

q. based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia in their residences, cars or those of trusted associates. This paraphernalia frequently includes scales, funnels, sifters, grinders, plastic bags, heat sealing devices, and dilutant;

r. based on my training and experience, drug dealers often create secret locations, commonly called "traps" or "hides" in their automobiles and residences. Often, drug dealers will use these traps or hides to conceal and store narcotics, weapons, money and other items and documents related to their drug trade; and

s. based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often possess, maintain and control other items related to their drug trafficking activities, as described in Attachment A to this affidavit, in their cars, homes, garages and out-buildings.

49.     On the basis of the foregoing information, there is probable cause to believe that fruits, instrumentalities and evidence of these crimes will be found at the **Target Premises**. There is also probable cause to believe that on the dates alleged herein, in the District of Connecticut, DONES and LAUREANO possessed with intent to distribute and did distribute fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) and Title 18, United States Code, Section 2; and conspired to possess with intent to distribute and distribute fentanyl, in violation of Title 18, United States Code, Section 846.

50.     Furthermore, there is probable cause to believe, and I do believe, that within the **Target Premises** there will be items that constitute contraband and/or evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), that include, but not limited to: controlled substances, packaging and paraphernalia, United States currency, money orders and

21

other financial instruments; books, records, receipts, notes, ledgers, and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances, and the laundering of drug proceeds; proceeds of drug sales and records of drug transactions; precious metals, jewelry and other items of value that may constitute proceeds of drug transactions; evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking activities, including bank and financial records, which include but are not limited to, cancelled checks, check stubs, cashier's checks, money orders, statements, wire transfer documents, deposit tickets, deposit receipts, and withdrawal slips and receipts; contraband, quantities of narcotics, scales, cutting agents and diluents and drug packaging materials; addresses or telephone numbers in books, papers, and/or notebooks; cellular telephones, computers, touch-screen tablets (e.g., i-Pads), electronic organizers, or other electronic devices, which may contain evidence of drug trafficking activities; firearms, ammunition, magazines and other weapons, which are tools of the drug trade; police scanners; photographs and videotapes of participants and associates in narcotic trafficking or money laundering activity and property acquired as a consequence of narcotics trafficking activities; safes and other secure storage containers and their contents, and safe deposit box keys; and identification documents, keys evidencing a possessory interest in and records relating to businesses, residences, other premises, vehicles, storage containers, mail boxes (including P.O. Boxes) and other assets (described in **Attachment A**, incorporated herein)

51.    Because this is an application that pertains to an ongoing criminal investigation, and because disclosure of the information contained herein as well as disclosure of the warrants and complaint being requested herein may compromise the investigation and increase the risk of harm for the law enforcement officers responsible for conducting the arrest and searches, I request

that the warrants, applications, complaint and this affidavit be ordered sealed by the Court, until

further order of the Court.

Michael Caron
Task Force Officer
Federal Bureau of Investigation

Subscribed and Sworn to before me
this ——— day of March, 2020.

/s/ TOF

THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE

*The truth of the foregoing affidavit was attested to me by Task Force Officer Michael Caron over the telephone on March 27, 2020,*

*12:52 p.m.*